# EXHIBIT 1

# EXHIBIT 1

## TRI-PARTITE AGREEMENT FOR UTILITY SERVICES

THIS TRI-PARTITE AGREEMENT FOR UTILITY SERVICES ("Agreement") is entered into as of this 24ᵗʰ day of January, 2000 (the "Date of Execution"), by, between and among Preferred Equities Corporation, a Nevada corporation, having a principal business address of 4310 Paradise Road, Las Vegas, Nevada 89109 ("PEC"), Central Nevada Utilities Company, a Nevada corporation, having a principal business address of 2101 East Calvada Boulevard, Pahrump, Nevada 89048 ("CNUC") and Covington Nevada Corp., a Nevada corporation, PGC Land Co., LLC, a Nevada limited liability company, and Executive Golf Land Co., LLC, a Nevada limited liability company, all of which have a principal business address of 4679 El Camino Cabos, Las Vegas, Nevada 89117 (collectively "CNC"). All parties to this Agreement are collectively referred to as the "Parties."

### RECITALS

CNUC is a public utility authorized by the Public Utilities Commission of Nevada ("PUC") to provide water and sewer service within a certificated service area located in Nye County, Nevada. PEC is the parent and one hundred percent (100%) owner of the stock of CNUC. PEC owns two golf courses, the Championship Golf Course and the Executive Golf Course, located in Nye County more particularly described on Exhibit "A" attached hereto and made a part hereof (the Championship and Executive Golf Courses are hereinafter referred to as the "Golf Courses"). CNUC and PEC are parties to a certain Agreement involving the storage and usage of reclaimed water at the Golf Courses dated April 28, 1995, which is superseded by this Agreement and which shall have no further force or effect (the "CNUC/PEC Agreement").

Pursuant to the CNUC/PEC Agreement, PEC agreed to allow CNUC to use sites on the Golf Courses for the disposal and retention of CNUC's reclaimed water generated from CNUC's reclaimed water treatment plant located on the Championship Golf Course ("Plant 3"). PEC further agreed, to the extent possible, to use the reclaimed water from Plant 3 for irrigation of the Golf Courses in substitution for well water presently being used for such irrigation purposes. PEC is currently using approximately 125,000,000 gallons of reclaimed water per year to irrigate the Championship Golf Course with no reclaimed water currently being provided and used at the Executive Golf Course. In consideration of PEC (i) allowing storage of the reclaimed water on the Golf Courses and (ii) using said reclaimed water to irrigate the Golf Courses, the CNUC/PEC Agreement provided that to the extent well water, as a result of reclaimed water being used to irrigate the Golf Courses, is available for use elsewhere in CNUC's certificated service area, CNUC would reserve certain "Water Credits" for PEC's use at other PEC properties located in said service area.

PEC and CNC have entered into an escrow ("Escrow") dated October 6, 1999, whereby PEC will sell to CNC at the close of escrow ("Close of Escrow") the Golf Courses and certain personal property used in the operation of the Golf Courses. The parties desire that (i) CNUC be allowed to store reclaimed water at the existing storage sites on the Golf Courses, or any future storage sites as may be agreed upon from time to time by the Parties; (ii) that CNC may use as much of said reclaimed water as CNC desires to irrigate the Golf Courses; and (iii) that CNC shall use on

the Golf Courses a minimum of 300 acre-feet annually of reclaimed water meeting applicable NDEP water quality criteria and the standards set forth for Blending in Section 5. The parties further desire that PEC shall get the benefit of all Water Credits made available by use of the reclaimed water for irrigation at the Golf Courses as set forth and limited by Section 8. The Parties further desire that the benefits under this Agreement be allocatable by CNC between the Golf Courses.

Accordingly, in consideration of the premises and other good and valuable consideration acknowledged as received by all of the parties to this Agreement, the Parties hereby agree as follows.

1.    Condition Precedent. This Agreement is subject to the Close of Escrow and sale of the Golf Courses from PEC to CNC occurring on or before March 3, 2000 or such later date as may be mutually agreed to by PEC and CNC. This Agreement is to be executed on or before the Close of Escrow and upon the Close of Escrow and execution of this Agreement, the CNUC/PEC Agreement shall concurrently, without any further action on the part of any party to the CNUC/PEC Agreement or this Agreement, terminate and shall have no further force or effect.

2.    Storage and Use of Reclaimed Water. Attached hereto as Exhibit "1" and made a part hereof, is Table 1 ("CGC Lake Data"). Said Table 1 lists the existing ponds on the Championship Golf Course. The pond shown at hole number 6 is empty and will not be used. The pond shown at hole number 8 as existing is not in use. Accordingly, there are nine (9) existing ponds on the Championship Golf Course currently in use for reclaimed water storage ("Existing Storage").

CNC agrees to (i) use reclaimed water available from CNUC for the purpose of irrigating the Golf Courses to the extent CNC deems reasonable under the circumstances, but in no event less than 300 acre-feet annually of reclaimed water meeting applicable NDEP water quality criteria and the standards set forth for Blending in Section 5; and (ii) allow CNUC to use the Existing Storage and to have access to the Golf Courses for distribution purposes as set forth and limited by Section 3, at no cost to CNUC. CNC may, in CNC's sole discretion and at CNC's sole cost, engineer, provide, and install water level sensing and other control equipment as necessary to maintain water levels in the Existing Storage and at any future storage sites by restricting flows of reclaimed water from CNUC and by other means as CNC deems fit (the "Control Equipment"). CNUC and PEC shall cooperate with CNC in the design and installation of Control Equipment, and shall make available all requested information and grant access to any facility within or adjacent to the Golf Courses for the installation and maintenance of such equipment. CNC shall be responsible for any maintenance of Control Equipment as CNC, in its sole discretion, shall deem necessary.

In consideration of CNC's agreements pursuant to Section 2 of this Agreement, and in consideration of the covenants of CNC pursuant to Section 3 of this Agreement, CNUC will provide CNC first priority reclaimed water of a sufficient quality and quantity to meet CNC's Golf Course irrigation requirements at a cost of zero cents (0¢) per gallon. In the event CNUC is unable to provide reclaimed water sufficient to meet CNC's requirements, CNUC shall substitute another water source to meet CNC's requirements to be paid for by CNC at CNUC's actual cost. In the event any regulatory agency having jurisdiction over the matter, including, but not limited to, the

Public Utilities Commission of Nevada, issues a final decision or formal order that prohibits CNUC or its successors or assigns from providing water at CNUC's actual cost rather than an approved prevailing rate, CNC shall pay CNUC the prevailing rate for the water and PEC shall pay CNC on a monthly basis the difference between the prevailing rate and CNUC's actual cost for delivering the water. Notwithstanding any contrary provision herein, this Agreement shall not compel CNUC to deliver greater than 1319.94 acre-feet annually to the Championship Course and 482.93 acre-feet annually to the Executive Course from all water sources (reclaimed water, well water, and potable water).

   3. <u>Easements in Favor of CNUC</u>.  Subject to the provisions below, CNC hereby covenants and agrees to grant to CNUC easements over, under and through the Golf Courses for the following uses (i) an easement for ingress and egress to that certain well site known as well #15, located between Calvada Boulevard and the hole number 3 fairway of the Championship Golf Course; (ii) an easement(s) for the installation and operation of pipelines running to and from CNUC's existing or future reclaimed water treatment plants for the conveyance and storage of reclaimed water through portions of the Executive Golf Course at sites approved by CNC; (iii) an easement ten feet in width across the fourth fairway of the Championship Golf Course for installation of a gravity sewer line; (iv) an easement for ingress and egress to that certain well site known as well #16, located between the 18th green of the Championship Golf Course and the ornamental pond located directly in front of the Championship Golf Course clubhouse; and (v) such other easements as may from time to time be agreed upon by CNUC and CNC to carry out the intentions of the Parties to this Agreement. CNC shall also grant CNUC an easement for ingress and egress to the water quality monitoring wells located adjacent to the second fairway of the Championship Golf Course and near the pumphouse on the ninth hole of the Championship Golf Course. On or before the close of Escrow, PEC shall deed to CNUC a strip of land not to exceed eighty feet (80') in width by three hundred thirty seven feet (337') in length adjacent to Plant 3, subject to the following: CNC shall retain the right to use such land for golf course play until satisfactory plans for the said strip and any improvements thereon are improved by CNC and CNC completes, at CNUC's cost, the reconfiguration of the course to take into account such strip usage by CNUC. Finally, CNC shall grant to CNUC an easement twenty (20) feet in width around Plant 3 for vehicular access to and from said Plant 3. All easements granted by CNC shall be non-exclusive and require that CNUC coordinate any construction activities with CNC and minimize construction, installation, and operations effect on golf course play and appearance, and be relocatable. Furthermore, CNUC shall avoid interrupting or inconveniencing CNC's day to day business. Easements granted for pipelines or other infrastructure shall require that CNUC restore any disturbed landscaping on the described property and any damage to appurtenances thereon to a condition equal to that prior to CNUC's disturbance, and shall require that any CNUC improvements be made below ground. In the event the property cannot be restored as set forth herein, CNUC shall, with CNC's approval, provide similar landscaping or improvements at an alternative location. All easements granted for access shall be so limited and shall not convey the right to disturb or construct improvements on the property. All improvements within the easements will be constructed to assure that the Golf Courses remain operational, and CNC shall have the right to perform any required restoration at CNUC's cost.

To the extent any Party requires a change in grade or other change that necessitates relocation of the utilities or improvements constructed pursuant to this Agreement, the Party requiring such change shall be solely responsible for all costs associated with such relocation, as well as the cost to repair any damaged landscaping or improvements.

CNUC will prepare for CNC the legal descriptions and exact site locations for each of the above described easements and PEC's land conveyance for the review and reasonable approval of CNC. CNC will prepare the easement documents, and the parties agree to cooperate and work diligently to complete and record same within a reasonable time after closing.

4.      Treatment of Reclaimed Water. CNUC shall treat the reclaimed water at Plant 3, and at any future plant(s) that supplies reclaimed water to the Golf Courses in accordance with standards and regulations established by the Nevada Division of Environmental Protection where no buffer zone is required. CNUC shall comply with applicable discharge requirements pertaining to discharges from Plant 3, or any future plant(s) supplying reclaimed water to the Golf Courses, issued by the Nevada Division of Environmental Protection or any other governmental agency having jurisdiction. During the Term of this Agreement, CNUC shall perform all sampling and laboratory testing required by any applicable regulatory or permitting authority, including, but not limited to, the Nevada Division of Environmental Protection, and any testing required under CNUC's reclaimed water discharge permit(s). Furthermore, CNUC shall perform such additional testing as CNC may from time to time request by giving written Notice to CNUC (the "Additional Testing"). CNC shall be solely responsible for all costs incurred by CNUC for any such Additional Testing. Notwithstanding the foregoing, testing required at any time by applicable authorities for CNUC's operation of the reclaimed water facilities shall not be considered Additional Testing, and CNC shall not be required to pay for same. Initial Additional Testing shall include daily tests for ECw, total dissolved solids, chlorides, ammonia, and Ph, which CNUC shall provide to CNC on a daily basis by facsimile or other means acceptable to CNC.

5.      Blending. If at any time ECw exceeds 2.0 dS/m, the tds exceeds 1050 ppm, or the concentration, in CNC's sole discretion, of any other constituent could have a deleterious impact on Golf Course operations, CNUC shall blend at the water reclamation plant a sufficient amount of well water with the reclaimed water such that the ECw of the blended water delivered to the Golf Courses does not exceed 2.0 dS/m, the tds does not exceed 1050 ppm, and/or the constituent of concern is mitigated. To the extent additional infrastructure is required to accomplish the blending required by this Section, CNC shall be solely responsible for all engineering, construction, and costs associated therewith, and CNUC's blending obligation shall not accrue until the completion of any such additional infrastructure. CNC shall pay for water blended with reclaimed water to meet the quality criteria outlined herein at CNUC's actual cost. In the event any regulatory agency having jurisdiction over the matter, including, but not limited to, the Public Utilities Commission of Nevada, issues a final decision or formal order that prohibits CNUC or its successors or assigns from providing water at CNUC's actual cost rather than an approved prevailing rate, CNC shall pay CNUC the prevailing rate for the water and PEC shall pay CNC on a monthly basis the difference between the prevailing rate and CNUC's actual cost for delivering the water.

6.    Cooperation.  The Parties shall cooperate fully with one another in the preparation, filing and processing of all regulatory and use applications for permits and such other documents as may be required to effectuate the terms of this Agreement.  All such filings and other applications for permits and approvals are to be made at CNUC's sole cost and expense.

7.    Appurtenant Water Rights.  PEC previously conveyed to CNUC water rights Permits 52367 (182.92 acre-feet annually ("afa")) and 47074 (300.01 afa), which remain appurtenant to the Executive Golf Course, and water rights Permits 46309 (363.30 afa), 46310 (2.50 afa), 46316 (294.12 afa), 46317 (511.20 afa), 46324 (119.26 afa), 46325 (29.16 afa), and 46326 (0.40 afa), which remain appurtenant to the Championship Golf Course (collectively the "Appurtenant Water Rights"). Except as expressly provided in Section 8, below, CNUC agrees that the Appurtenant Water Rights shall remain appurtenant to the Golf Courses for the exclusive use on the Golf Courses by CNC or its successors during the term of this Agreement.  Furthermore, CNUC agrees that unless and until CNUC conveys the Appurtenant Water Rights to CNC or its successors or assigns, CNUC shall maintain the Appurtenant Water Rights such that the rights are not subject to forfeiture, cancellation, or abandonment proceedings by the State Engineer.  CNUC agrees to cooperate with and support CNC in making applications before applicable regulatory agencies, including the Public Utilities Commission of Nevada, to authorize the conveyance of the Appurtenant Water Rights, wells, pumps, and appurtenant delivery systems to CNC or its assignees or designees.

8.    PEC Water Credits.  The Parties acknowledge that it is PEC's and CNUC's intention to curtail to a certain extent the use of the Appurtenant Water Rights on the Golf Courses through the use of reclaimed water as contemplated herein. To the extent Appurtenant Water Rights use at the Golf Courses can be replaced with reclaimed water, PEC will be awarded "Water Credits" by CNUC at a rate determined by the State Engineer of Nevada, which will allow PEC to develop other PEC properties within CNUC's service area. CNUC and CNC agree that all Water Credits will be reserved for use by PEC or its assigns, and that CNUC may file change applications to move the amount of Appurtenant Water Rights so credited and/or reallocate, with CNC's consent, the remaining Appurtenant Water Rights between the Golf Courses.  CNC hereby agrees that it shall have no interest whatsoever in or to any Water Credits unless same are separately assigned to CNC by PEC or its assigns.  PEC has the right, in its absolute and sole discretion, to assign Water Credits to CNC and/or any other third party it so desires upon terms and conditions satisfactory to PEC. Notwithstanding anything to the contrary herein, except as CNC may authorize in its sole discretion from time to time, the Appurtenant Water Rights shall at no time during the term of this Agreement amount to less than 1578.87 afa [1319.94 afa (Championship Course) + 482.93 afa (Executive Course) - 224 afa (agreed upon maximum Water Credits] for use on both Golf Courses.  PEC shall have five years from the Date of Execution in which to obtain from the State Engineer in writing Water Credits of up to 224 afa.  Any Water Credits not granted by the State Engineer within five years from the Date of Execution shall remain Appurtenant to the Golf Courses throughout the Term of this Agreement as provided in Section 7.  Furthermore, and notwithstanding anything to the contrary herein, CNUC shall maintain fresh water service to the Golf Courses for turf and landscaping management purposes, such as flushing when salt concentrations become toxic or during

periods of overseeding. Fresh water requested by CNC in lieu of readily available reclaimed water of a quality meeting applicable NDEP criteria and the standards set forth for blending in Section 5 shall be paid for by CNC at CNUC's actual cost. In the event any regulatory agency having jurisdiction over the matter, including, but not limited to, the Public Utilities Commission of Nevada, issues a final decision or formal order that prohibits CNUC or its successors or assigns from providing water at CNUC's actual cost rather than an approved prevailing rate, CNC shall pay CNUC the prevailing rate for the water and PEC shall pay CNC on a monthly basis the difference between the prevailing rate and CNUC's actual cost for delivering the water.

9.    Maintenance of Potable Water Connection. CNUC shall maintain a potable water connection for potable water use at the Golf Courses.

10.    Term. The Term of this Agreement shall be fifty (50) years from the Date of Execution set forth above. The Term shall be extended automatically for up to two, twenty-five (25) year periods unless CNUC or its successors or assigns, or CNC or its successors or assigns, give written notice to the other party of its intention to terminate the Agreement. No such notice shall terminate the Agreement unless delivered as provided below at least eighteen (18) months prior to the conclusion of the Term or the extended Term as the case may be, but not more than two (2) years prior to the conclusion of the Term or the extended Term as the case may be.

11.    Indemnification. CNUC, PEC and CNC agree to respectively indemnify, save and hold one another harmless from any and all claims, causes of action or liability arising from the acts, errors or omissions in the performance of this Agreement by any of the respective parties' directors, officers, employees and/or agents in the performance of this Agreement, including but not limited to the payment of a prevailing party's legal fees, costs and expenses associated with the defense of any such claim. Furthermore, CNUC shall carry general liability insurance, naming CNC as an additional insured, providing not less than $1,000,000 coverage per occurrence for injury or damage to persons or property as a result of CNUC's actions under this Agreement.

12.    Assignment. CNUC shall not assign any of its rights or obligations under this Agreement, or any part thereof, or any right or privilege connected therewith, except upon the acquisition of CNUC by a third party or the written consent of PEC and CNC, provided that such consent shall not be unreasonably withheld. In determining whether to consent to any such assignment hereunder, the continued interest of CNC in the performance of CNUC's obligations by a credit worthy entity with managerial capability shall be of substantial importance, and the refusal to consent to any assignment which does not meet such criteria shall not be deemed unreasonable. Any consent by PEC and CNC shall not be, or be deemed to be, a consent to a subsequent assignment to another person(s). CNC may assign its rights and obligations under this Agreement, in whole or separately, and among any number of assignees, all as CNC deems appropriate. No assignment hereunder shall operate to release the assignor of any then-existing obligation.

13.    Notices. All notices and communications regarding the Agreement shall be in writing and shall be delivered by registered or certified mail, return receipt requested, postage prepaid or via

r:\Law_server\ddrive\Lawfirm Doc-CLIENTS 2391 01 documents agreement16.wpd

6

facsimile, so long as (i) said facsimile is transmitted from 9 to 5 p.m. Pacific time, Monday through Friday, on a day that is not a recognized Federal or State of Nevada holiday; (ii) the sending machine produces a record of said transmission; (iii) such record is maintained by the sending party and (iv) a copy of said facsimile, with a copy of the record of transmission is sent via the United States mail. All parties to this Agreement are to receive a copy(ies) of all such notices if such notice is not directed to said party. Notices are to be sent as follows:

        If to PEC:
                Jon A. Joseph
                Preferred Equities Corporation
                4310 Paradise Road
                Las Vegas, Nevada 89109-6597
                Facsimile: (702) 369-4398

        If to CNUC, to:
                Michael L. Johnson
                Central Nevada Utilities Company
                P.O. Box 730
                Pahrump, Nevada 89041
                Facsimile: (702) 727-7752

        IF to CNC, then to:
                (i)  Manager, Executive Golf Land Co., LLC
                4679 El Camino Cabos,
                Las Vegas, Nevada 89117
                Facsimile: (702) _____

                And to:
                (ii)  Manager, PGC Land Co., LLC
                4679 El Camino Cabos,
                Las Vegas, Nevada 89117
                Facsimile: (702) _____

        Any party hereto may change its address and/or facsimile number for notice purposes by giving the other parties written notice of any such change in the manner set forth above.

        14.     Recordation of Agreement and Enforcement.  A memorandum of this Agreement shall be recorded against the Golf Courses on or before the Close of Escrow.  All covenants and agreements of each respective party hereto shall be enforceable by an action(s) for specific performance brought by the party(ies) seeking such relief as well as additional damages that may be awarded to the party(ies) seeking such relief.

7

15.    Miscellaneous. All representations, warranties, covenants, terms, conditions, personal obligations, and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by, the respective heirs, legal representatives, successors and assigns of the Parties. This Agreement represents the entire understanding between the Parties and supersedes all prior representations and agreements both written and oral with respect to the contents contained herein, including but not limited to the CNUC/PEC Agreement.  Time shall be of the essence of this Agreement.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party drafting this Agreement.  Headings to Sections are for convenience of reference and are not to be considered in the interpretation of this Agreement.  This Agreement shall be governed by and construed in accordance with the substantive and procedural laws of the State of Nevada.

16.    Attorneys fees. If any legal action or other proceeding is brought for the enforcement of this Agreement and/or collection of any amounts due hereunder for an award of attorneys' fees by the Court, the successful or prevailing Party or Parties (as determined by the Court) shall be entitled to recover reasonable attorneys' fees and other costs incurred in such action or proceeding, in addition to any other relief to which such Party or Parties may be entitled.

17.    Severability.  If any terms or provisions of this Agreement shall, to any extent, be held invalid unenforceable, the remainder of the Agreement shall not be affected.

18.    Signature in Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A signature page delivered by facsimile transmission shall be deemed an original, unless and until an actual original of such signature page is provided.  This Agreement shall not be effective until the execution and delivery among the Parties of at least one set of counterparts.  The Parties authorize each other to detach and combine original signature pages and consolidate them into a single identical original.  Any one of such completely executed counterparts shall be sufficient proof of this Agreement.

19.    Waivers.  A waiver or breach of any covenant or provision of this Agreement shall not be deemed a waiver of any other covenant or provision of this Agreement, and no waiver shall be valid unless in writing and executed by the Party or Parties against whom enforcement is sought.

20.    Construction.    Section headings and captions of this Agreement are, and the arrangement of this instrument is, for the sole convenience of the Parties to this Agreement. Section headings, captions, and the arrangement of this instrument shall in no way affect, limit, amplify, or modify the terms and provisions of this Agreement.  The singular form shall include the plural and vice-versa.

IN WITNESS WHEREOF, the Parties have agreed as of the date first appearing herein.

PREFERRED EQUITIES CORPORATION

By: _____ Jon B. Joseph
    ~~Gregg A. McMurtrie~~
Its: ~~Executive~~ Vice President

CENTRAL NEVADA UTILITIES
COMPANY

By: _____ Jon B. Joseph
    ~~Michael L. Johnson~~
Its: ~~President~~ Secretary

COVINGTON NEVADA CORP.

By: _____
    Kenneth Sheer
Its: Partner

PGC LAND CO., LLC

By: _____
    Kenneth Sheer
Its: Partner

EXECUTIVE GOLF LAND CO., LLC

By: _____
    Kenneth Sheer
Its: Partner

STATE OF _Nevada_ )
COUNTY OF _Clark_ )SS

This instrument was signed and acknowledged before me this _24th_ day of _January_ 2000, by _Jon A. Joseph, V.P._ of Preferred Equities Corporation, a Nevada corporation, for and on behalf of said corporation.

_____
Notary Public    S. RHODES
Notary Public, State of Nevada
Appointment No. 99592841
My Appt. Expires Oct. 28, 2003

STATE OF _Nevada_ )
COUNTY OF _Clark_ )SS

This instrument was signed and acknowledged before me this _24th_ day of _January_ 2000, by _Jon A. Joseph Secretary_ of Central Nevada Utilities Company, a Nevada corporation, for and on behalf of said corporation.

_____
Notary Public

S. RHODES
Notary Public, State of Nevada
Appointment No. 99592841
My Appt. Expires Oct. 28, 2003

STATE OF    NEVADA )
COUNTY OF CLARK )SS
)

This instrument was signed and acknowledged before me this _21st_ day of January, 2000, by Kenneth Sheer, Authorized Agent of BGM PAHRUMP GOLF CO. LLC as Sole Member and Manager of PGC Land Co., LLC, a Nevada limited liability company, for and on behalf of said company.

_____
Notary Public


S. RHODES
Notary Public, State of Nevada
Appointment No. 99592841
My Appt. Expires Oct. 28, 2003

STATE OF    NEVADA                    )
                                      )SS
COUNTY OF  CLARK                      )

    This instrument was signed and acknowledged before me this 21st day of January, 2000, by Kenneth Sheer, Authorized Agent of BGM PAHRUMP GOLF CO. LLC as Sole Member and Manager of Executive Golf Land Co., LLC, a Nevada limited liability company, for and on behalf of said company.

Notary Public

> S. RHODES
> Notary Public, State of Nevada
> Appointment No. 99592841
> My Appt. Expires Oct. 28, 2003

STATE OF    NEVADA                    )
                                      )SS
COUNTY OF  CLARK                      )

    This instrument was signed and acknowledged before me this 21st day of January, 2000, by Kenneth Sheer, Authorized Agent of Covington Nevada Corp. a Nevada corporation, for and on behalf of said corporation.

Notary Public

> S. RHODES
> Notary Public, State of Nevada
> Appointment No. 99592841
> My Appt. Expires Oct. 28, 2003

This Instrument Was Prepared By:
Ann B. Miller
Cohen, Todd, Kite & Stanford, LLC
525 Vine Street, 16th Floor
Cincinnati, Ohio 45202-3124
Telephone:    (513) 421-4020
Facsimile:    (513) 241-4490
290477.1

## EXHIBIT A

## GOLF COURSES LEGAL DESCRIPTION

All that real property situated in the State of Nevada, County of Nye, bounded and described as follows:

All of Lots One Hundred Twenty-Eight (128) through One Hundred Thirty-One (131) in Block Seventeen (17) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

EXCEPTING THEREFROM all of Mount Charleston Golf Estates - Phase 2, as shown be map thereof recorded July 27, 1983 as File No. 37401 in the Office of the County Recorder of Nye County, Nevada.

FURTHER EXCEPTING THEREFROM COMMENCING AT THE Southwest Quarter corner of Lot Thirteen (13) of Block Seventeen (17) of CALVADA VALLEY UNIT NO. 7, File No. 36023, Nye County records being the TRUE POINT OF BEGINNING.

THENCE North 76°39'29" East a distance of 69.50 feet; thence South 12°53'08" East a distance of 23.44 feet; thence curving to the right along a curve concave to the West, having a radius of 18.50 feet, through a central angle of 86°50'44" an arc length of 28.04 feet; thence South 73°57'36" West a distance of 53.80 feet; thence curving to the right along a curve concave to the East, having a radius of 24.00 feet through a central angle of 83°54'25", an arc length of 35.15 feet; thence North 22°07'59" West a distance of 20.30 feet; thence North 69°11'32" East a distance of 30.26 feet to the TRUE POINT OF BEGINNING.

FURTHER EXCEPTING THEREFROM all of the right, title and interest in and to all the minerals, including gas, coal, oil, and oil shales as disclosed by Deed recorded January 10, 1961 in Book 43, Page 374, Official Records, Nye County, Nevada.

APN's 39-661-01; 39-552-09; 39-541-13; 39-511-26

Also

All of Block Thirty-Five (35) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada and that portion of Lot One Hundred Thirty-Two (132) in Block Thirty-Five (35) of CALVADA VALLEY UNIT NO. 7, as shown by map thereof recorded February 5, 1973 as File No. 36023, Official Records, Nye County, Nevada, more particularly described as Parcel One Hundred Thirty-Two (132) as shown by Parcel Map recorded June 13, 1994 as File No. 354169 and by that Boundary Line Adjustment Map recorded April 4, 1995 as File No. 369979 of Official Records, Nye County, Nevada.

EXCEPTING THEREFROM Lot One (1) through One Hundred Twenty-Five (125) in Block Thirty-Five (35) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

FURTHER EXCEPTING THEREFROM Lots One Hundred Forty-One (141) and One Hundred Forty-Two (142) in Block Thirty-Five (35) of Amended Plat OF CALVADA VALLEY UNIT NO. 7, BLOCK 35, LOT 127, as recorded December 28, 1993 as Document No. 345009 in the Office of the County Recorder of Nye County, Nevada.

FURTHER EXCEPTING THEREFROM Lots One Hundred Thirty-Four (134) through One Hundred Forty (140) in Block Thirty-Five (35) of Amended Plat of CALVADA VALLEY UNIT NO. 7, BLOCK 35, LOT 132, as recorded December 28, 1993 as Document No. 345010 in the Office of the County Recorder of Nye County, Nevada.

FURTHER EXCEPTING THEREFROM all of the right, title and interest in and to all of the minerals, including gas, coal, oil shales as disclosed by Deed recorded January 10, 1961 in Book 43, Page 374, Official Records, Nye County, Nevada.

APN's 39-651-01; 39-651-02; 39-761-01; 39-601-15; 39-621-08; 39-751-05; 39-741-01

Also

All of Block Forty-Two (42) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

EXCEPTING THEREFROM Lots One (1) through Seventy-Three (73) in Block Forty-Two (42) of CALVADA VALLEY NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

FURTHER EXCEPTING THEREFROM Lots Seventy-Eight (78) and Seventy-Nine (79) in Block Forty-Two (42) of Amended Plat of CALVADA VALLEY UNIT NO. 7, BLOCK 42, LOT 76 as recorded December 28, 1993 as Document No. 345011 in the Office of the County Recorder of Nye County, Nevada.

FURTHER EXCEPTING THEREFROM all of the right, title and interest in and to all of the minerals including gas, coal, oil and oil shales as disclosed by Deed recorded January 10, 1961 in Book 43, Page 374, Official Records, Nye County, Nevada.

APN's 39-704-09; 39-731-01; 39-821-19; 39-783-07

Also

All of Block Forty-Nine (49) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

EXCEPTING THEREFROM Lots One (1) through Sixty-One (61) in Block Forty-Nine (49) of CALVADA VALLEY UNIT NO. 7, as recorded on February 5, 1973 as Document No. 36023, Official Records, Nye County, Nevada.

FURTHER EXCEPTING THEREFROM Lots Sixty-Four (64) through Sixty-Six (66) in Block Forty-Nine (49) of Amended Plat of CALVADA VALLEY UNIT NO. 7, BLOCK 49, LOT 63, as recorded December 28, 1993 as Document No. 345008 in the Office of the County Recorder of Nye County, Nevada.

FURTHER EXCEPTING THEREFROM all of the right, title and interest in and to all of the minerals, including gas, coal, oil and oil shales as disclosed by Deed recorded January 10, 1961 in Book 43, Page 374, Official Records, Nye County, Nevada.

APN's 39-681-08; 39-691-34

Also

Lots Two Hundred Seven (207) through Two Hundred Thirteen (213) in Block Twenty-Two (22) of CALVADA VALLEY UNIT NO. 3, as shown by map thereof recorded October 5, 1970 as File No. 20292 in the Office of the County Recorder of Nye County, Nevada.

EXCEPTING THEREFROM all of the right, title and interest in and to the minerals, including gas, coal, oil and oil shales as disclosed by Deed recorded January 10, 1961 in Book 43, Page 374, Official Records, Nye County, Nevada.

APN's 42-511-07; 42-521-01; 42-521-02; 42-621-23; 42-651-18; 42-651-05; 42-671-01

# Exhibit 1

## Table 1: CGC Lake Data

| Lake (Hole) | Status | Water Surface Elevation | Surface Area | Volume | Bottom |
|---|---|---|---|---|---|
| 3 | Exist. | 2600± | 5,379 SF | 127,500 gal | unlined |
| 3A | Fut. | 2600± | 27,541 SF | 778,500 gal | unlined |
| 5 | Exist. | 2600± | 6,018 SF | 145,700 gal | unlined |
| 6 | Empty | 2600± | —— | —— | unlined |
| 6A | Fut. | 2600± | 58,485 SF | 1,964,100 gal | unlined |
| 7A | Fut. | 2600± | 35,125 SF | 1,094,500 gal | unlined |
| 8 | Exist. | 2608± | —— | 930,000 gal | lined |
| 9A | Exist. | 2614.0 | 23,058 SF | 560,000 gal | lined |
| 9B | Exist. | 2614.0 | 17,033 SF | 530,000 gal | lined |
| 9C | Exist. | 2614.0 | 20,657 SF | 1,529,000 gal | lined |
| 9D | Fut. | 2614.0 | 35,627 SF | 1,437,500 gal | lined |
| 9E | Fut. | 2614.0 | 38,717 SF | 1,086,900 gal | unlined |
| 11 | Fut. | 2625± | 37,032 SF | 860,000 gal | unlined |
| 12 | Exist. | 2636± | 43,958 SF | 1,400,000 gal | unlined |
| 14 | Exist. | 2636± | 33,709 SF | 1,145,500 gal | unlined |
| 16 | Exist. | 2610± | 36,797 SF | 1,280,000 gal | unlined |
| 17 | Exist. | 2604± | 53,957 SF | | |
| | | | 489,438 SF | 14,869,200 gal | |

The area of existing unlined lakes (3,5,12,14,16 & 17) is 196,163 SF.
∴ Infiltration volume:  (0.16 gal/ft$^2$/day)(196,163 ft$^2$) = 31,386 gpd

The area of proposed unlined lakes (3A,6A,7A &11) is 158,183 SF.
∴ Additional future infiltration volume:
   (0.16 gal/ft$^2$/day)(158,183 ft$^2$) = 25,309 gpd

(c)   Evapotranspiration is 57 in/yr in the Pahrump area.
Evaporation volume of existing ponds (3,5,9A,9B,9C,12,14,16 & 17):
∴ (57 in/yr)(1 yr/365 days)(1 ft/12 in)(7.481 gal/ft$^3$)(256,911 ft$^2$) = 25,012 gpd

The area of proposed future ponds (3A,6A,7A,9D,9E, & 11) is 232,527 SF
∴ Additional future evaporation volume:
   (57 in/yr)(1yr/365days)(1ft/12in)(7.481 gal/ft$^3$)(232,527 ft$^2$) = 22,638 gpd

(d)   Total daily volume of effluent disposal on the Championship Golf Course at worst wintery conditions =
1,501,000 + 31,386 + 25,309 + 25,012 + 22,638 = 1,605,345 gpd

# EXHIBIT 2

# EXHIBIT 2

## OPTION TO PURCHASE

This Option to Purchase (this "Agreement "), made and entered into this 27th day of May, 2009, by and between JOREI ENTERPRISES, LLC, whose address is One Park Plaza, Suite 500, Irvine California 92614 hereinafter referred to as "Seller", and ASHLAND CAPITAL, LLC, whose address is 8290 W. Sahara, Suite 186, Las Vegas, Nevada 89117, hereinafter referred to as "Buyer". Buyer and Seller may sometimes be referred to in the singular as the "Party" or collectively as the "Parties".

### WITNESSETH:

WHEREAS, Seller is the owner of that certain real property know as the Willow Creek Golf Course, ("WCGC"), along with any water rights that may run with the land, whether granted by deed or other agreement ("Water Rights"), all of which is located in the unincorporated area of the Town of Pahrump, County of Nye, in the state of Nevada and further described in attached "Exhibit A", along with any and all personal property ("Personal Property"), along with all recorded and non-recorded rights, title, and interest to the herein described, WCGC, Water Rights, and Personal Property (collectively the "Property");

WHEREAS, since Seller acquired the Property on February 12, 2009, Buyer has performed certain maintenance and incurred certain costs relating to the Property, in exchange for which Seller has allowed Buyer to conduct its investigation of the Property for Buyer's intended development and use; and

WHEREAS, Buyer desires to procure an option to purchase the above-described Property and Seller desires to grant an option to Buyer to purchase the Property.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto and for the mutual covenants contained herein, Seller and Buyer hereby agree as follows:

1.    DEFINITIONS.   For the purposes of this Agreement, the following terms shall have the following meaning:

    a.    "Execution Date" shall mean the date upon which the last party to this Agreement shall duly execute this Agreement;

    b.    "Option Term" shall mean that period of time commencing on the Execution Date and ending ninety (90) days thereafter.

    c.    "Closing Date" shall mean the last date of the Option Term.

    d.    "Option Payments" shall mean the payments made to Seller by Buyer, in the amount hereinafter described.

2.    GRANT OF OPTION.   For and in consideration of the payment of Option Payments payable to Seller as set forth herein, Seller does hereby grant to Buyer the exclusive right and Option ("Option") to purchase the Property upon the terms and conditions as set forth herein.

07/07/2004  10:53    9164422997                    CORP OFFICE                    PAGE  03/06

3.    PAYMENT OF OPTION PAYMENT AND OTHER OBLIGATIONS OF BUYER. Upon execution of this Agreement by Buyer, and by the 18th day of each month during the Option Term, Buyer agrees to pay Seller a payment of Eighty Thousand Dollars ($80,000.00) as a monthly Option Payment.

a.    During the Option Term it is agreed by the Parties that the Buyer shall be responsible for the following items in relation to the operation & maintenance of the Property:

i.    Maintaining the existing ponds on the WCGC property as required to avoid pond overflow, objectionable odors, and stagnation of effluent in the ponds;

ii.    Using, and maintaining proper record thereof, a minimum of 300 acre feet annually of treated effluent for irrigation of the "Golf Courses" (as that term is defined in the Complaint, i.e., the Willow Creek Golf Course and Lakeview Golf Course) as required by Tri-Partite Agreement for Utility Service dated January 24, 2000;

iii.    Irrigation to Lakeview Golf Course.

iv.    Employ necessary personnel to maintain the Property and facilitate proper distribution of the effluent to the Golf Courses.

v.    Timely payment of any and all bills (e.g. electricity) to ensure proper operation and maintenance as required herein.

vi.    Adequate property and liability insurance coverage (pro-rated to the Execution Date).

vii.    Any property tax due (pro-rated to the Execution Date).

viii.    Comply with any court order.

ix.    Indemnify and hold Seller harmless from and against any failure of any of the foregoing obligations of Buyer.

Seller shall give Buyer a credit in the amount of Forty-Seven Thousand Five Hundred Dollars ($47,500.00) per month against the next monthly Option Payment due for each month that the Seller fulfills the obligations outlined above.

b.    Seller shall give Buyer a credit against the Purchase Price in an amount equal to all Option Payments paid by Buyer to Seller prior to the Closing Date.

c.    Buyer acknowledges that all costs incurred by Buyer relating to the Property prior to the Option Period were in consideration of Seller allowing Buyer to conduct its investigation of the Property and Buyer shall not be credited or reimbursed for any portion of such costs.

4.    EXERCISE OF OPTION. Buyer may exercise its exclusive right to purchase the Property at any time during the Option Term. Buyer shall provide Seller ten (10) days written notice in advance of its intent to purchase the Property.

WC 00301

5.    CONTRACT FOR PURCHASE & SALE OF REAL AND PERSONAL PROPERTY.  In the event that the Buyer elects to exercise its exclusive Option as provided for above, Seller agrees to sell and Buyer agrees to buy the Property, and both Parties agree to execute a contract for such purchase and sale of the Real and Personal Property in accordance with the following terms and conditions:

a.    Purchase Price. The "Purchase Price" for the Property shall be the sum of Seven Million Three Hundred Fifty Thousand Dollars ($7,350,000.00); however, Buyer shall receive a credit towards the Purchase Price in the amount and as described above.

b.    Closing Date. The Closing date shall be on or before the last date of the Option Term as herein described;

c.    Closing Costs. Buyer's and Seller's costs of closing the Purchase and Sale Contract shall be borne by the Buyer and up to One Hundred Thousand Dollars ($100,000.00) of the closing costs shall be credited to Buyer against the Purchase Price, any closing costs above that amount shall be borne by Buyer;

d.    Default by Buyer; Remedies of Seller. In the event Buyer, after exercise of the Option, fails to proceed with the closing of the purchase of the Property pursuant to the terms and provisions as contained herein and /or under the Purchase and Sale Contract, or upon any other default of the Buyer, Seller shall be entitled to retain the Option Fee as liquidated damages and shall have no further recourse against Buyer;

6.    MISCELLANEOUS.

a.    No Representations or Warranties. Buyer acknowledges and agrees that Seller has not and by this Agreement does not in any way make any representations or warranties with respect to the Property or Seller's interests in or rights thereto, save and except that Seller has all necessary right, title and interest to convey the Property as described herein.

b.    Binding Effect. This Agreement shall not become effective and binding until fully executed by both Parties.

c.    Notice. All notices, demands and /or consents provided for in this Agreement shall be in writing and shall be delivered to the Parties hereto by hand or by United States Mail with postage pre-paid. Such notices shall be deemed to have been served on the date mailed, postage pre-paid. All such notices and communications shall be addressed to the Parties at the addresses shown above or at such other address as either Party may specify to the other in writing.

d.    Governing Law. This Agreement shall be governed by and construed in the accordance with the laws of the State of Nevada.

e.    Termination. If Buyer fails to exercise the option on or before the expiration of the Option Term, or make any Option Payment when due, this Agreement and the rights of Buyer hereunder will automatically and immediately terminate without notice. Thereafter, Buyer must properly execute, acknowledge, and deliver to Seller within 3 days of a request therefore, a release, quitclaim deed, or any other document required by Seller to verify the termination of this Agreement.

    f.     <u>Successors and Assigns</u>. Buyer shall not be allowed to assign or transfer this Agreement or any of its rights or obligations hereunder without the prior consent of Seller, which consent shall not be unreasonably withheld, conditioned, or delayed. Any attempt to assign or transfer made in violation of this provision shall be considered an event of default and result in the automatic termination of this Agreement. Except as set forth in the preceding sentence, this Agreement shall apply to, inure to the benefit of and be binding upon and enforceable against the Parties hereto and their respective heirs, successors and or assigns..

    g.     <u>Time</u>. Time is of the essence of this Agreement.

    h.     <u>Headings</u>. The headings inserted at the beginning of each paragraph and/or subparagraph are for convenience of reference only and shall not limit or otherwise affect to be used in the construction of ant terms of provisions hereof.

    i.     <u>Cost of this Agreement</u>. Any cost and /or fees incurred by the Buyer or Seller in executing this Agreement shall be borne by borne by the Party incurring such cost and / or fee.

    j.     <u>Entire Agreement</u>. This Agreement contains all of the terms, promises, covenants, conditions and representations, made or entered into by or between Seller and Buyer and with respect to the Option and all other matters contained herein and constitutes the sole and entire agreement between Seller and Buyer with respect thereto. This Agreement may not be modified or amended unless such amended is set forth in writing and executed by both Seller and Buyer with the formalities hereof.

    IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed under proper authority:

As to Buyer this 27ᵗʰ day of May, 2009.

Buyer: Ashland Capital, LLC

By: JAMES W, SCOTT

Witness: _____

As to Seller this 5 day of June, 2009.

Seller: Jorei Enterprises LLC

By: Robert Mosier, Receiver for Private Equity Management Group
Witness: _____

WC 00303

EXHIBIT A
**Willow Creek Golf Course**
Located in Pahrump, Nye County, Nevada 89048

**PROPERTY IDENTIFICATION:**

**Any Appurtenant Water Rights owned by Seller related to the following parcels.**

APNs: 039-651-01
      039-511-31
      039-541-13
      039-591-15
      039-601-01
      039-511-31
      039-661-02
      039-681-17
      039-691-37
      039-704-10
      039-731-01
      039-741-01
      039-751-09
      039-783-08
      039-821-20

WC 00304

# EXHIBIT 3

# EXHIBIT 3

Case No. CV28780

FILED

2009 SEP 11 P 3: 12

NYE COUNTY CLERK
BY DEPUTY

IN THE FIFTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF NYE

Utilities Incorporated of Central Nevada,
A Nevada Corporation,

        Plaintiff,

  -v-

                            PRELIMINARY INJUNCTION

Ashland Capital, LLC, a Nevada Limited
Liability Company; and Does 1-2; inclusive

        Defendants.
_____/

    The Court, having reviewed Utilities, Inc., of Central Nevada's ("UICN") Motion for

Temporary Restraining Order and Preliminary Injunction (and the exhibits attached thereto),

together with the Verified Complaint and other filings.

    IT IS ORDERED that Ashland Capital, LLC ("Ashland") and its representatives and

employees shall continue using effluent discharged form UICN's WWTP 3 up to at least 300

acre feet of water annually or on a daily basis of 267,804 gallons per day. The defendant by

agreement may take additional waters as may be available.

    The Court issues such order to protect UICN and the public from irreparable injury.

**FIFTH JUDICIAL DISTRICT COURT**
ESMERELDA, MINERAL AND NYE COUNTIES

The ponds in which UICN discharges have the potential to overflow and cause damage to nearby residences. If this order is not entered UICN will then have to either terminate service to its approximately 2,700 customers, including the local hospital, or risk flooding local residences. If UICN shuts down service to its customers, those customers, will not be able to discharge water to the sewer system. The result is that customers will be unable to flush toilets, take showers, operate washing machines, run dishwashers, or discharge tap water from sinks. All of the above has the strong potential to harm human health and safety. This injury is irreparable because there is no sufficient legal remedy to the harms of human health of flooding residence with treated waste water, terminating sewer service and/or water service to approximately 2,700 customers including a local hospital, or the depletion of aquatic life.

It is further ordered that Ashland maintain the existing ponds on the Willow Creek Golf Course property as required to avoid organic contamination of the water stored in the ponds, ensure that any effluent discharged is in compliance with a legal requirements, and avoid objectionable odors, pond over flow, and stagnation of effluent in the ponds.

It is further ordered the Court's grant of this Preliminary Injunction is conditioned upon UICN's deposit with court clerk in the amount of $100.00 as required by Nevada Rule of Civil Procedure, Rule 65 (c).

DATED this **11** day of September 2009.


_____
DISTRICT JUDGE

FIFTH JUDICIAL DISTRICT COURT
ESMERELDA, MINERAL AND NYE COUNTIES

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that on the ___11___ day of September 2009, she

mailed (or hand delivered) copies of the foregoing Order to the following:

Laura K. Granier, Esq.
Elizabeth High, Esq.
Lionel Sawyer & Collins
11 Bank of America Plaza
50 West Liberty Street
Reno, Nv. 89501

Dale K. Kleven, Esq.
7371 Prairie Falcon, Ste 120
Las Vegas, Nv. 89128

GERIE CLIFFORD, Secretary to
DISTRICT JUDGE

# EXHIBIT 4

# EXHIBIT 4



# STATE OF NEVADA

### Department of Conservation & Natural Resources

### DIVISION OF ENVIRONMENTAL PROTECTION

*Jim Gibbons, Governor*

*Allen Biaggi, Director*

*Leo M. Drozdoff, P.E., Administrator*

N E V A D A   DIVISION OF
ENVIRONMENTAL PROTECTION
*protecting the future for generations*

April 26, 2010

Robert Mosier
Jorei Enterprises. LLC
c/o PEMGROUP
One Park Plaza. Suite 500
Irvine, CA 92614

Certified Mail
7008 1140 0004 4031 3925

**Re:    Willow Creek Golf Course – Enforcement Action NV042610W1
            NEV2005503**

Dear Mr. Mosier.

The enclosed Finding of Alleged Violation and Order are issued by the Administrator of the Nevada Division of Environmental Protection (NDEP) pursuant to Nevada Revised Statute (NRS) 445A.675 and 445A.690. NDEP requires compliance with the terms and conditions of the Order. Any violation of the enclosed Order could subject Jorei Enterprises (Jorei) to an action for relief pursuant to NRS 445A.695. 445A.700 and 445A.705.

The Finding of Alleged Violation and Order were developed as a result of Jorei failing to comply with permit NEV2005503 and NRS 445A.465. NDEP inspected Willow Creek Golf Course (WC) and observed various violations onsite. In response to these observations. NDEP requested specific documents be submitted and actions be taken to return WC back to compliance. Issues at WC included. but were not limited to. pond liner integrity. pond maintenance. an outdated Effluent Management Plan (EMP) and an outdated Operations and Maintenance Manual. A submittal deadline was provided. Jorei failed to provide or complete any of the required items by the stipulated deadline. NDEP sent a second letter to Jorei extending the deadline, and again Jorei did not respond. After sending a final notice to Jorei, NDEP contacted Jorei via telephone. NDEP was told to contact a third party. NDEP contacted the third party and approved a requested deadline extension. Over the next few weeks. NDEP approved several more requested deadline extensions because telephone discussions indicated progress was being made and NDEP believed the quality of the submittal was of greater significance. Ultimately, Jorei failed to provide a single required item. The only item submitted to NDEP. five days past due. was the same outdated EMP that NDEP had requested to be updated. It was sent to NDEP without as much as a transmittal or cover letter.

After four months of working with Jorei and its affiliates. nothing has been achieved. NDEP strived to achieve compliance outside of enforcement but due to Jorei failing to follow through on its commitments. NDEP is forced to issue a formal Enforcement Action.

 
UICN CA 00262

Pursuant to NRS 445A.690. the enclosed Finding of Alleged Violation and Order are final and not subject to review unless. thirty (30) days after the Order is served, a written petition for a hearing (Form 3, attached) is received by the State Environmental Commission (SEC). Send the required documents to the address indicated on Form 3. or by facsimile machine to (775) 687-5856. Please provide the undersigned with a copy of any correspondence which Jorei has with the SEC regarding this matter.

Please contact (775) 687-9502 with questions regarding this matter.

Sincerely.

Jeffrey Erwin
Compliance Officer
Water Pollution Control

cc w/ attachments (except Form 3):
 Leo Drozdoff, P.E.. Administrator. NDEP
Tom Porta. P.E.. Deputy Administrator. NDEP
Jon Palm. Ph.D.. P.E.. Bureau Chief. BWPC
Valerie King. Enforcement Supervisor. BWPC
Diana Silsby. Compliance Coordinator, BWPC
Alan Tinney. P.E., Supervisor. BWPC
Cliff Lawson, P.E., Supervisor. BWPC
Nadir Sous. P.E.. Technical Services. BWPC-LV
John Walker, State Environmental Commission
Bill Frey. Deputy Attorney General
Caroline Tanner, Deputy Attorney General
Nye County Commission, P.O. Box 153, Tonopah. NV 89049
James Scott. Ashland Capital. 1126 Second Street. Sacramento. CA 95814
Curtis Moen. Moen Consulting. 3760 South Vanguard Avenue, Pahrump, NV 89048

UICN CA 00263

THE MATTER OF                           )
WILLOW CREEK GOLF COURSE )
1 of 4                                          )

## Finding of Alleged Violation

I.      This finding is made based on the following facts:

A.      The State of Nevada Department of Conservation and Natural Resources, Division of Environmental Protection (NDEP), under the authority of Nevada Revised Statutes (NRS) 445A.445, shall administer and enforce the provisions of NRS 445A.300 to 445A.730, inclusive, and all rules, regulations and standards promulgated by the State Environmental Commission (SEC) and all Orders and permits promulgated by the department.

B.      NRS 445A.465 "Discharge of a Pollutant without a Permit Prohibited"

Except as authorized by a permit issued by the Department pursuant to the provisions of NRS 445A.300 to 445A.730, inclusive, and regulations adopted by the SEC, it is unlawful for any person to: discharge from any point source any pollutant into any waters of the State.

C.      Permit NEV2005503 "Authorization to Discharge" was amended and issued to Jorei Enterprises for Willow Creek Golf Course (WC) on August 17, 2009. The following are sections of permit NEV2005503.

1.      I.B.5 – The effluent irrigation and effluent storage lakes shall not cause objectionable odors on or off the site.

2.      I.B.6 – The irrigation system, storage ponds/lakes and ancillaries shall be constructed and operated in accordance with plans approved by the Division. All plans must be approved by the Division prior to the start of construction. All changes to the approved plans must be approved by the Division.

3.      I.C.1 – There shall be no discharge of substances that would cause a violation of (the) water quality standards of the State of Nevada.

4.      I.E.2.d – Quarterly Report – Monitoring results obtained during the previous three (3) months shall be summarized for each month and reported quarterly on a Discharge Monitoring Report (DMR) Form received in this office no later than the 28th day of the month following the end of each quarter.

5.      II.A.2 – Facilities Operation – The Permittee shall at all times maintain in good working order and operate as efficiently as possible all treatment or control facilities, collection systems or pump stations installed or used by the Permittee to achieve compliance with the terms and conditions of this permit.

UICN CA 00264



IN THE MATTER OF                    )
WILLOW CREEK GOLF COURSE)
2 of 4                              )

6.    II.B.5 – Penalty for Violation of Permit Conditions – NRS 445A.675 provides that any person who violates a permit condition is subject to administrative and judicial sanctions as outlined in NRS 445A.690 through 445A.705.

7.    III.A.3 – Holding Pond Conditions – If any effluent is placed in ponds, such ponds shall be located, operated and constructed so as to:

c.    Prevent escape of wastewater by leakage other than as authorized by this permit.

D.    On December 15, 2009 NDEP conducted an inspection of WC. While onsite NDEP observed several issues, including pond liners that appeared to be ripped and a significant amount of sediment buildup on the bottom of the receiving pond. NDEP also noted debris in the receiving pond.

E.    On December 22, 2009 NDEP sent a letter to Jorei Enterprises (Jorei) alerting it to the violations which NDEP had noticed onsite. The letter called for:

• The liners to be evaluated by a licensed engineer, and a plan and schedule to replace or repair the liners be submitted should the evaluation determine such action necessary.
• A plan and schedule to address sediment accumulation issues.
• A plan and schedule to address the tumbleweeds and debris in the receiving effluent pond.
• A revised Effluent Management Plan (EMP) be submitted.
• A revised Operations and Maintenance Manual be submitted.

The letter requested that all requirements be complete and submitted to NDEP by January 29, 2010.

F.    The required items were not received by January 29, 2010.

G.    On February 10, 2010 NDEP sent a second notice to Jorei requiring that the items requested in the December 22, 2009 letter be submitted to NDEP by February 19, 2010. This letter was sent certified and a signed return receipt was received by NDEP on February 18, 2010.

H.    The required items were not received by February 19, 2010.

I.    On February 24, 2010 NDEP sent a final notice to Jorei requiring that all items mentioned in the December 22, 2009 letter be submitted to NDEP by March 5, 2010. NDEP informed Jorei that failure to provide the requested information would lead to an Enforcement Action.

UICN CA 00265



IN THE MATTER OF                     )
WILLOW CREEK GOLF COURSE)
3 of 4                                     )

J.  On March 4, 2010 NDEP had not received the requested information nor heard from Jorei and elected to contact Jorei. NDEP was informed that while Jorei was the owner of WC, it had ceded operational control to Ashland Capital (Ashland). Jorei asked that NDEP contact Ashland and make it aware of NDEP's requirements. NDEP contacted Ashland to inform it of the WC issues and the multiple correspondence NDEP had sent to Jorei. Ashland asked to be sent a copy of all correspondence and be given a deadline extension.

    1.  NDEP emailed Ashland a copy of all previous correspondence

K.  On March 5, 2010 NDEP received a letter from Moen Consulting (Moen) acting as agent for Ashland and requesting a deadline extension.

L.  On March 8, 2010 NDEP approved an extension until March 12, 2010 for the submittal of the required information.

M.  On March 11, 2010 Moen requested a copy of the EMP that was on file at NDEP. This version of the EMP was outdated and was one of the items NDEP required to be updated. NDEP made the desired document available to a third party vendor who retrieved and copied the files for Moen.

N.  On March 12, 2010 Moen emailed NDEP requesting that Ashland be given another extension. Moen indicated that it would take additional time to properly gather all the information which NDEP had requested. Moen indicated the process would take an additional three weeks. After a telephone conversation with Moen, NDEP felt confident that progress was being made and that an extension would facilitate a more comprehensive submittal. NDEP therefore gave a new deadline of April 2, 2010.

O.  The required items were not received on April 2, 2010.

P.  On April 5, 2010 Moen emailed NDEP alerting it that the information which it had requested was being mailed via overnight delivery.

Q.  On April 7, 2010 a submittal was received by NDEP.

R.  On April 14, 2010 NDEP reviewed the submitted package. NDEP noted there was no cover letter and the only document submitted was the outdated EMP which NDEP had made available to Moen approximately a month earlier. No revisions or updates were noted. None of the other items which NDEP requested on December 22, 2009, were submitted.

S.  To date, Jorei has failed to submit any of the items requested in the December 22, 2010 letter needed to return WC to compliance.

UICN CA 00266

THE MATTER OF                    )
WILLOW CREEK GOLF COURSE)
4 of 4                          )

II.      On March 12. 2010 NDEP sent a letter to Moen notifying it that the 4th quarter 2009 Discharge Monitoring Report (DMR) had not been received. The DMR was due to NDEP by no later than January 28, 2010. NDEP provided an extended deadline of March 30, 2010 to submit the DMR. To date, NDEP has not received the 4th quarter 2009 DMR. nor has it received the 1st quarter 2010 DMR. due on April 28. 2010.

III.     **Willow Creek Golf Course has failed to comply with the aforementioned parts in I.B and I.C of the Finding of Alleged Violation NV042610W1 in that:**

   A.    Jorei has failed to properly maintain the effluent ponds. causing the discharge of pollutants into the groundwater. in violation of NRS 445A.465 and permit NEV2005503.

   B.    Jorei has failed to submit the 4th Quarter 2009 DMR by January 28, 2010 in violation of permit NEV2005503.

IV.      On the basis of the facts stated above. the Administrator of the Nevada Division of Environmental Protection finds Jorei Enterprise is in alleged violation of NRS 445A.465 and permit NEV2005503.

_4-26-10_
Date

_Jeffrey Erwin_
Jeffrey Erwin
Compliance Officer
Water Pollution Control

UICN CA 00267



THE MATTE     F                    )
WILLOW CREEK GOLF COURSE )

NV042610W1

### Order

This Order is issued under the authority vested in the Director of the Department of Conservation and Natural Resources by Nevada Revised Statute (NRS) 445A.445 and 445A.450, which has been delegated to the Nevada Division of Environmental Protection (NDEP), and is issued in accordance with the provisions of NRS 445A.660, 445A.675 and 445A.690.

On the basis of the Finding of Alleged Violation, attached hereto and made a part of this Order, the Administrator of NDEP, pursuant to the authority delegated to him by the Director, Department of Conservation and Natural Resources, has determined that Jorei Enterprises (Jorei) is in alleged violation of NRS 445A.465 and permit NEV2005503.

It is hereby ordered that Jorei complete the following acts by May 7, 2010:

1.     Submit to NDEP a completed 4th Quarter 2009 Discharge Monitoring Report (DMR), including all attendant laboratory reports, plots, etc.

2.     Submit a completed 1st Quarter 2010 DMR, if it has not yet been submitted, to NDEP.

It is hereby ordered that Jorei complete the following acts by May 28, 2010:

1.     Provide NDEP with an evaluation of the pond liners prepared by a licensed professional engineer certified in Nevada and in accordance with NDEP guidance Working Technical Sheet (WTS) 6. Furthermore, should liner replacement or repair be needed, a plan and approvable schedule shall be submitted to NDEP documenting how and when such replacement/repair will occur.

2.     Submit to NDEP an updated Effluent Management Plan for Willow Creek Golf Course (WC) pursuant to NDEP guidance WTS-1B.

3.     Submit to NDEP an updated Operations and Maintenance Manual for WC pursuant to NDEP guidance WTS-6.

4.     Submit to NDEP a plan and approvable schedule to remove the accumulated sediment from the effluent ponds.

5.     Submit to NDEP a plan and approvable schedule to address the tumbleweeds and debris which have accumulated in and around the effluent receiving pond.

6.     Submit an explanation why the ponds have not been properly maintained in the twelve months, approximately, which Jorei has been responsible for WC compliance.



ı THE MATTI   )F                    )
WILLOW CREEK GOLF COURSE )

NV042610W1

7.    Provide an explanation why Jorei and its associates failed to comply with the required actions in the December 22, 2009 letter after requesting multiple extensions to allow for a comprehensive submittal.

8.    Supply NDEP with a plan, to be implemented immediately, that outlines how all parties currently involved with WC will coordinate with each other and with NDEP to ensure environmental compliance in the future.

9.    Provide NDEP with the economic benefit realized in regards to savings in labor, materials, disposal and any other associated costs in regards to Jorei's failure to properly manage and maintain WC.

10.   Contact NDEP to arrange a meeting, to be held at NDEP's office in Carson City, to show cause why NDEP should not seek a civil penalty for the violations cited.

_4-26-10_____
Date

_Jon Palm_____
Jon Palm, P.E., Ph.D.
Bureau Chief
Water Pollution Control

# EXHIBIT 5

# EXHIBIT 5

FILED

2012 MAY 31  A 9: 28

AMY DOWERS

NYE COUNTY CLERK
BY DEPUTY

IN THE FIFTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF NYE

| | |
|---|---|
| Utilities Incorporated of Central Nevada, a Nevada Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Willow Creek Holdings, LLC, a Nevada Limited Liability Company; Aram Maissian, Inc., a Nevada Corporation; Jorei Enterprises, LLC, a California Limited Liability Company; and Ashland Capital, LLC, a Nevada limited liability company,<br><br>Defendants. | Case No. CV 27399<br><br>Dept No. 1<br><br>**JUDGMENT** |
| Utilities Inc. of Central Nevada, a Nevada Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Ashland Capital, LLC, a Nevada Limited Liability Company; Jorei Enterprises, LLC, a California Limited Liability Company; and Mosier & Company, Inc., in its official capacity as Permanent Receiver of PEMGroup and its subsidiaries and affiliates,<br><br>Defendants.<br><br>and<br><br>Lakeview Golf Association, Inc., a Nevada Limited Liability Corporation,<br><br>Plaintiff, | Consolidated Case: CV 28780 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1100 BANK OF AMERICA PLAZA
50 WEST LIBERTY ST.
RENO,
NEVADA 89501
(775) 788-8666

vs.

Ashland Capital, LLC, a Nevada Limited
Liability Company,

Defendant.

## JUDGMENT

On May 25, 2012, this Court issued its Findings of Fact and Conclusions of Law in the above-referenced matter. Pursuant to the findings outlined therein, the Court hereby issues judgment in favor of Utilities Inc. of Central Nevada ("UICN"), as follow:

### Declaratory Judgment in Favor of UICN

1.     The tripartite agreement runs with the land and is enforceable against all current and future owners or operators of the Willow Creek Golf Course.

2.     The tripartite agreement requires that the owner and operator of the Willow Creek Golf Course maintain the golf course ponds in accordance with all applicable permits, NDEP requirements and all federal, state and local legal and regulatory requirements.

3.     UICN has the right to access the ponds in which UICN stores its effluent at the Willow Creek Golf Course.

4.     UICN has no obligation to maintain the ponds at the Willow Creek Golf Course. The owner of the Willow Creek Golf Course must maintain the ponds.

5.     The owner of the Willow Creek Golf Course is required to maintain the Willow Creek Golf Course ponds in a manner that avoids contamination of the effluent stored therein and in compliance with all federal and state laws, regulations and other requirements including those imposed under the discharge permit issued by the Nevada Division of Environmental Protection.

///

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
00 BANK OF AMERICA PLAZA
50 WEST LIBERTY ST.
RENO,
NEVADA 89501
(775) 788-8656

2

**Monetary Judgment Against Jorei and Ashland**

1.      In total, Ashland Capital, LLC ("Ashland") is liable to UICN for **$616,530.46** in damages for the period from December 26, 2008 through March 31, 2012.  Judgment in favor of UICN and against Ashland is awarded in that amount.

2.      In total, Jorei Enterprises, LLC ("Jorei") is liable to UICN for **$608,801.67** in damages for the period from February 18, 2009 through March 31, 2012.  Judgment in favor of UICN and against Jorei is awarded in that amount.

**Permanent Injunction**

1.      The current owner of the Willow Creek Golf Course, Caldera P & G, and its agents, successors and assigns shall continuously provide adequate storage for (and, as necessary, distribution of) all effluent discharged by UICN's Waste Water Treatment Plant #3 and use effluent discharged from UICN's Waste Water Treatment Plant #3 up to at least 300 acre feet of water annually or on a daily basis of 267,804 gallons per day.

2.      The current owner of the Willow Creek Golf Course, and its agents, successors and assigns, must maintain the existing ponds on the Willow Creek Golf Course property as required to avoid organic contamination of the water stored in the ponds, ensure that any effluent discharged from or stored in the ponds is in compliance with all legal requirements, including NDEP requirements, and avoid objectionable odors, pond overflow, and stagnation of effluent in the ponds.

3.      The current owner of the Willow Creek Golf Course must comply with the requirements set forth in the December 22, 2009 letter from the Nevada Department of Environmental Protection to the then-owner of the Willow Creek Golf Course, Jorei Enterprises, LLC.  Those requirements include that the owner must have a professional engineer evaluate the current liner and make a plan for completion of applicable repairs, make a plan and schedule to

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
00 BANK OF AMERICA PLAZA
50 WEST LIBERTY ST.
RENO,
NEVADA 89501
(775) 788-8666

3

1  remove or address the accumulated sediment in the pond, make a plan and schedule to remove

2  the accumulated tumble weed and other debris around the pond area, develop and submit to

3  NDEP a revised and updated Effluent Management Plan (EMP) in accordance with WTS-1B,

4  and submit an updated operations and maintenance manual that addresses the following areas:

5  posting, earthwork, odor, aerators, sludge, debris removal, synthetic lines, operating depth, algae

6  blooms, mosquitoes.   In addition, the owner of the course shall complete all remediation and

7  repairs to the Willow Creek Golf Course ponds as identified by NDEP.

8

9  DATED this **25** day of May, 2012.

10

11

12  DISTRICT JUDGE

13

14

15  Prepared by:

16

17  Laura K. Granier, Esq., SBN 7357
    Courtney Miller O'Mara, Esq., SBN 10683

18  LIONEL SAWYER & COLLINS
    50 W. Liberty St., Suite 1100

19  Reno, NV 89501
    Telephone: (775) 788-8666

20  Facsimile: (775) 788-8682
    Email: lgranier@lionelsawyer.com

21       comara@lionelsawyer.com

22

23

24

25

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
00 BANK OF AMERICA PLAZA
60 WEST LIBERTY ST.
RENO,
NEVADA 89501
(775) 788-8666

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of May 2012, she mailed copies

of the JUDGMENT to the following:

Laura K. Granier, Esq.
Elizabeth a. High, Esq.
Lionel Sawyer & Collins
1100 Bank of America Plaza
50 West Liberty Street
Reno, Nevada 89501

Courtney Miller O'Mara, Esq.
David C. O'Mara, Esq.
The O'Mara Law Firm
311 East Liberty Street
Reno, Nv. 89501

Mark Hafer, Esq.
Patti, Sgro & Lewis
720 South 7th St.
3rd Floor, Las Vegas, NV 89101

Randolph Howard, Esq.
Kolesar and Leatham
3320 West Sahara Ave.
Las Vegas, Nv. 89102-3202

Ashland Capital, LLC
c/o James Scott
1500 W. El Camino, Suite 211
Sacramento, California 95833

Ashland Capital, LLC
c/o Susan Trimboli, Resident Agent
8290 W. Sahara Ave. Suite186
Las Vegas, Nv. 89117

Caldera P&G
c/o Timothy Post, Esq.
736 S. Center Street
Reno, Nv. 89501

1

2   James Scott

3   c/o Timothy Post, Esq.
736 S. Center Street

4   Reno, Nevada 89501

5

6

7                       Secretary to District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28